Mr. Mason, you're on reserve five. Yes, Your Honor. By the way, Your Honor, I'm a member of the Nevada Bar also. And I have a mediation in front of Judge Philip Pro, retired Judge Philip Pro, on Tuesday. And he said for me to give you his regards. Well, tell him I always used to get him to apply the Phil Prolactic rule when I could. Anyhow, we are here on an appeal in regards to an ASVCA decision regarding the interpretation of a regulation regarding base access. Let me establish a framework, OK? Yes. Have you looked at Stockton East Water District? No, Your Honor. It follows Connor and I think clarifies a little bit. But we evaluate the applicability of the Sovereign Acts Doctrine using a two-factor test. Yes, yes. We ask whether the governmental act is properly attributable as a contractor or sovereign. And you conceded sovereign, OK? The second factor is if the government's act was a genuine public and general act. And if so, we ask whether that act would otherwise release the government from liability under ordinary principles of contract law, which is to say impossibility of performance. Do you agree with that? Yes, Your Honor. This isn't so much a Sovereign Act issue. We don't disagree that the government had the right to limit base access. There's absolutely no dispute about that. I understand that. And in fact, I walk around DC today, and I see different procedures in place and security than it was five years ago, 10 years ago. What we have an issue here, it's basically- My question is, do you have anything about impossibility of performance in the decision below? There is no impossibility of performance. What we have here, though, is the government saying that- I don't see it discussed below, is what I'm saying, by the board. Right, and it's not. It's not. And I don't think there was an impossibility of performance. What we have here, though, Your Honor, is a situation where the government has the right to restrict base access. The commanding officer has pretty much unrestricted, and it's egregious and so forth. But the bottom line is, we didn't have that in this case. The base commander had the authority to limit the base access any way that she deemed appropriate. The problem- I think somebody said to act at whim in one of the emails. But what we have, and it's set forth in appendix 170, where the Corps of Engineers say, we researched the base security restrictions according to the Maelstrom Air Force base personnel and documentation dated before March of 2006. The security restrictions for certain types of combat layer were in effect before August of 2006 award of the aforementioned contract. The October 2007 policy was a reissue of the same restrictions as those implemented shortly after September 11 of 2001. We have no information indicates the base access policy has changed since September 2001. So what they are saying is, there was no change in base access policy. If that's true, then you lose, right? If they had always done this the way they did in 2007, you're out, right? Because you agreed the 2007 policy was OK. That is correct. The number of this is, did it actually change or not? That is correct. And even the board recognized that up until spring of 2007, there were no restrictions in place, and the people were getting access- These people were getting in before 2007. That doesn't mean there wasn't a policy. It could either mean there wasn't a policy and they did change it, or nobody was enforcing the policy. That is correct. So now what we have here is a situation where we're looking at the regulations. And what do the regulations say? And what was that access policy? Can I ask you a question about that? Yes. I am a little puzzled. I think you both, although the government can respond too, both agree that this is a matter of regulatory interpretation. Yes. So we would employ our normal rules of regulatory interpretation. If it's plain, it's plain. If it's ambiguous, we'd look to, we'd probably defer to the government. Do you agree that it's regulatory interpretation? I do. It seems odd to me, honestly, that it's regulatory interpretation when this is a base-specific policy on access. I don't understand why it's not a factual determination. Because the contract required them to follow the base restrictions, the base regulations, and the base directives. That's what we look to. And so that's our position, is we look to those regulations. Sure, no, no, no, I get that. But I don't understand. When we're trying to define what a particular base's policy on security access is, why that's not a factual issue versus a regulatory issue? Well, my understanding of the case law is that the regulatory review is a denotable review in which the government No, no, no, I get that. Maybe I'm not being clear. I don't understand why both sides think this is a regulatory issue. It seems to me to be a fact issue. Oh. Why is it a regulation? Yes. Well, in regards to the regulation aspect of it, it is to control the base access that may be different from each and every different area. And therefore, it is specifically limited to miles from Air Force Base. And so we have to look at miles from Air Force Base's interpretation and their access regulations. I don't know if I'm answering your question. It's fine. So what we're looking at, though, is we're looking at two sentences from the pre-2007 regulation that says, we're going to send this to NCIC for a Watson-Warren checks and have it right in front of me, and that we're going to. Yes. Sorry. And then the second sentence is about waivers of unfavorable results, right? Yes, there's actually two in 2005. And so that's what we're doing, is the government is saying, we have a 2005 regulation that was issued before the contract was awarded, and we have a 2007 memo from the commanding officer. So the 2005 says, a 911 dispatcher will run the employee's name through the National Criminal Information Center system for a Watson-Warrens check. Unfavorable results will be scrutinized and eligibility will be determined on a case-by-case basis. Correct. That's what we're talking about. That's what we're talking about. Because if they're going to run it through for NCIC check, we're checking everything, then the words for a Watson-Warrens check becomes superfluous. Why do you even have it there? And so we looked at this provision and said, you're going to look for Watson-Warrens, and unfavorable results of that Watson-Warrens will preclude you from entering the base, or it needs to be determined on a case-by-case basis. Now there is also- They say that people know, it's a term NCIS. Watson-Warrens was a term of our, and everybody knew it meant more than just Watson-Warrens. It included a criminal check, and that the second sentence doesn't make any sense if that weren't the case. Right. And so we look at the instructions, the security base instructions were issued five days later. And what does that say? It says the VCC staff will forward the contracting ELA to the 911 dispatch center. A 911 dispatcher certified on the NCIC will run the contractor names through the NCIC for Wants and Warrants, period. After the dispatcher completes the NCIC check, they will sign the letters and return them to the VCC. So it's telling the contractor, we're the NCIC system for Wants and Warrants. If they had eliminated that information, if they had just said, look, this is going to be a global check. Is your position that Wants and Warrants has a specific meaning within the NCIC system? Yes. The Wants and Warrants are Wants and Warrants. It's not a criminal background check. Yes. Just as- The problem with what I'm having for all of this is the record doesn't establish one way or another what everybody was thinking of when they were using this term. I mean, I think you're probably right that Wants and Warrants at NCIC, taking that phrase as used by NCIC, means something different than background check. It means people that have outstanding warrants or are wanted for something, is what I think. That's true. And as you go through the history- But that's a fact finding. Excuse me? But that's a fact finding. And there was testimony from the commanding officer that, at least her inquiry indicated, that Wants and Warrants had always meant, oh no, we look at everything. Well- I'm remembering from looking at this. Yes. One of the things was, when we pull up the background check, it provides us with everything else. But it's not so it provides everything else. What we're looking for is Wants and Warrants. And so by expanding that and eliminating all these other people, you've then drastically narrowed the field. But see, this is why I ask you whether this is a fact question or a regulatory question. Because if it's a fact question that we're reviewing for substantial evidence, then we have testimony from the government that this policy on its face was meant to include a general background check, even though it only referenced NCIC Wants and Warrants. If that's the case, I think you have a hard time. Right. And that's what we're saying- If this is a regulatory interpretation case, then we're looking first to see whether the regulation is plain on its face, right? Correct. And if it's plain on its face, we don't get to all this other stuff. Even if the government meant something by it, they're bound by the plain language they put in the regulation. And it's our position that the plain language restricts it to a Wants and Warrants that this is not a factual issue. This is a regulation interpretation that needs to be reviewed de novo. And that you look at this specific language, there is no ambiguity. We are checking for this. Well, and the problem I guess I'm having is the board found that there was ambiguity because they said if you construe it literally, then there would be no reason to have the following sentences about having case-by-case eligibility and determinations because they're not going to let anybody on base that has an outstanding warrant. Right. Which, by the way, these- Do you think that creates ambiguity? On its face, it does not. If the court takes into consideration things that are inconsistent with it, it does create ambiguity. But you should not be using this testimony that's outside to be trying to construe the plain language. No, I'm not talking about the testimony outside. I'm talking about these two sentences put together, looking at them on their face. Is there ambiguity from saying, we'll do a Wants and Warrants check, and then we'll determine access on a case-by-case basis? The only reason why the court got there was because of testimony from the security commander. But if you look at this- Could it be that somebody could get a positive on the Wants and Warrants check, and it could be an outdated warrant, which is why there could be reason for a case-by-case basis? Oh, sure. There could be several reasons. Let's say there's a Wants and Warrants in Florida, and this is in Montana. And it's for unpaid child support, and you owe $1,200. Well, do you want to extradite him? No. So there's a multitude of reasons why an unfavorable result on a Wants and Warrants would result in it being sued. So I've taken up a lot of your time, but I just want to ask one final question. If we're still looking at this as a regulatory framework, and we find that it is ambiguous, then do you agree that we look at the agency's interpretation to see whether it gets stuff for us? Yes. OK. One other thing, and I will address this. You're eating your rebuttal time. I know I am, Your Honor. But this also deals with the constructive acceleration issue, because by saying this is a sovereign act, and it's excusable delay, but you don't get a time extension for it, we believe that under the rules of constructive acceleration that they shouldn't be entitled to time extension. Constructive acceleration when they don't get a time extension. Mr. Ginsburg. Your Honor, may it please the court, I'd like to pick up where you sort of left off with my colleague at the bar on what this would mean if you adopted their reading. Not only does it have the problem, as Judge Hughes identified, that if somebody has a Wants and Warrants, it was testimony. If you've got a Wants or Warrant, regardless if it's outstanding from Florida, you're still not getting on the base. They're not even going to go case by case. You have no chance of getting on the base. So it would exclude the second part of that portion. But even more importantly is this. Joe has a warrant out for him for murder. He's suspected of murder. And so he goes to try to get in, and they say, no, no. You've got a warrant. We're going to turn you over to the police. And so he goes, and he confesses to murder. Now, we know he's a murderer. And they put him out on bail until his sentencing. Now, according to the plaintiff's reading, now he gets to walk on base because it's an open door because he no longer has an open warrant. That can't be. Can I back you up? Do you agree that we're looking at this as a matter of regulatory interpretation? That was the way we described it in our brief. The statute, the organic statute that served as the basis of 101.3 and 101 does use the word regulatory. So I'm talking about 50 USC 797. And what it says is, a defense property security regulation is a property security regulation that, and one of the ways that it's created is by a military commander. So the statute says that. And that is the way we describe it on our brief. I think we get to the same conclusion whether we talk about it either way, because as it is. Well, I mean, you get to the same conclusion if we find it ambiguous. Yes, Your Honor. If we find that NCIC wanton warrants is a term of art, that means only wanton warrants. And it's plain, then we don't get to the same thing. That would require, yes, Your Honor. But that would require reading the statute as meaning that every convicted spy, felon, and the like could walk on the base, while people who might be only suspected of it could be stopped. And that doesn't, that would lead as the board found. I mean, there's also testimony that there was policies in place that they ran things through the Montana thing that would bring up those kind of felons. Well, and so, but, well, that was all part of the wanton warrants check. If I could take a step back for a second. Here's the problem for me, is it's clear that there was a practice of doing something maybe more than the wanton warrants check. But it's also clear you didn't enforce this practice for a long, long time against a bunch of people that were then suddenly excluded, that made this job very tough for this contractor to do. If I could respectfully change that, Your Honor, and say, no, the policy was the same. So for example, and I'm talking about. So are you admitting, then, that the policy wasn't enforced? I'm admitting that there was a loophole that was exploited and that was closed, yes. And so if I could give you an example. In 2006, we have a congressional letter that's in the record at A287, where Congressman Bacchus is writing, saying, we've got a person who is convicted of a crime who's not been allowed on the base. Why? And the explanation, this is before all of this arose. And the explanation was, we do a background check and felons are not allowed on the base. So this was the policy. What happened, as I understand it, and the record is not entirely clear, was that there was a policy allowing vouching, where a veteran could bring somebody else on the base by vouching for them. It wasn't really supposed to happen. It certainly wasn't supposed to happen for contractors. But it had happened, or at least it seems like that had happened. So there was testimony that people were able to get on base. It wasn't a good idea. They realized, security-wise, so they tried to put an end to this practice that was against policy. And that made it more difficult. But there's two important points to that, one of which is this. At the pre-construction meeting, where Talcott, where JTC, attended that meeting, they were told, and the minutes of that are at A270, they were told, background checks, the word background checks, would be conducted and that felons would be excluded. And we have the minutes for that, and we have the stipulated testimony of Mr. Barnett, which is cited by the trial judge, who said that he remembers that meeting and he remembers that being told along those lines. So they did have notice. They knew, if they were paying attention at that meeting, because they attended that meeting, JTC attended that meeting, as did GARCO, they had notice. So we have- Mr. Deser, I want to ask you about the Sovereign Act stuff. Yes, Your Honor. Two-part test. Pretty much, your opposing counsels conceded the first part. Yes, Your Honor. So let me take you to the second factor. If the Governments Act was a genuine public and general act, we ask, whether that act would otherwise release the government from liability under ordinary principles of contract law. Yes, Your Honor. That is impossibility. Yes, Your Honor. Neither the parties nor the board address that second factor. OK, and so- So, one, are we permitted to consider it? I have an answer. Yes. I mean, I believe that that would be illegal, as long as, I mean, you're reading the contract, and we believe that that's represented in the contract, so it would be illegal. I think you could do that without any fact. Has the government satisfied its burden of demonstrating the second factor? Yes, Your Honor. Where? Well, so if you look at the contract, this is in the appendix at 103, at the general area requirements, there's activities of the contractor, and I'm reading this, and contractors, employees, and subcontractors, and their employees, while on the base, will be conducted in accordance with base regulations. It's their responsibility to comply with base regulations. It's their responsibility to get their people ready, so that they can come on the base and meet the regulations of the base. What is the appendix for that? Did you say 301? It is appendix 103. Yes, Your Honor. And so it is their obligation, their responsibility, to get their people ready to come on the base. It certainly wasn't the government taking that responsibility, and turning back, Your Honor, to the Conner decision, which reads on to this case. In that case, it was found that Coke, that it was almost exactly the same. There was a perimeter established. Contractors weren't allowed to get on. And it turned out that the Coke vendor and the cable vendor, they did get on. And that they shouldn't have been allowed on. And that was a violation of the policy. And what the court held, what this court held in that case, was the fact that there were some exceptions and mistakes made in the policy didn't mean that the policy didn't exist and didn't mean it wasn't a sovereign act. So even though, in the past, the plaintiffs may have gotten some people on the base through a loophole, that didn't mean that the policy didn't exist, didn't mean it wasn't a sovereign act. And the fact that they had notice in that pre-construction meeting before they signed the contract. There's a course of practice. Yes, Your Honor. But before the plaintiffs signed the contract, in that pre-construction meeting, they were told that this was how it was going to be. So even if there had been, which, Your Honor, because it was against the base policy, I would say it wasn't a course of practice. Whatever it was before that, they were told at this meeting, before they signed the contract, that there wasn't, that there would be background checks and that felons would be excluded. And I mean, I find that it's somewhat helpful to you. But if they've been operating under the same policy in the same language for a long time, it doesn't seem like this was isolated incidences of a loophole. It seems like this company did a substantial portion of the work on this base. It's in an isolated area. They do the work. They had habitually used convict labor as it's the regulation. That was their testimony. We don't have any evidence of that, because nobody kept records of it. But they did testify to it, and it was understood. But that's the only, yeah, it's understood. It's the only evidence we have. So we have to take that. That most of this, a lot of their workforce were parolees and in pre-release. We have a letter from the pre-release program to another company saying, we can't get your people on base anymore, so we can't participate. Why don't we take that into context when we look at that pre-construction meeting? It doesn't sound like it was announced as, oh, there's a big change in policy here. We're not going to let you on base anymore if you have a conviction or are on parole or probation. And if they knew that it had the same once and once language and for however many years they were getting people in, then despite this one reference at the meeting, they thought the policy was something else. And they may have thought the policy respectfully, Your Honor. It sounds like the government thought the policy was something else. No, Your Honor. And if you read that congressional letter at A287. Well, that's in 2006. I mean, if it's been going on for. Yeah, but that's before any of this happened. So that was the stated policy. But there's also testimony. Testimony of Mr. Ward. Testimony of Major Finnan, of Colonel Finnan, I apologize. And both of them said this was the practice. And also, it just makes sense that convicts didn't have an open door on a military base, on a PL-1 military base. So respectfully, Your Honor, no, both the ongoing policy, the ongoing rule, and the practice was to keep these people off. The fact that there was a loophole and that it was mistaken exactly mirrors the Connors case, which this court exactly rejected as a basis for undermining sovereign immunity. 20 years of practice doesn't sound like a loophole. Your Honor, if they hadn't been told clearly at that meeting before they signed the contract. Were they told clearly? Anything that they hadn't been told clearly before for the last 20 years? There's nothing in the record about it. But in that meeting, it was stated that there would be a background check. And I mean, basically, they have to listen in the pre-construction meeting and understand what the rules are going to be before they sign the contract. And although it's not in this record, it was presented and signed by counsel's firm. The stipulations were that their bid was not relied upon, JTC's bid was not relied upon by GARCO when they put in their bid. So they could have, at that meeting, if they'd been paying attention, all they had to do is listen, as Mr. Barnett did, realize, oh, even if we'd done it before, maybe there's a problem here. Maybe we just check before we sign the contract. That's all we were asking, is that they listen at the meeting that they were supposed to be listening at. And then before they sign the contract, know what they're signing. And that's separate from the fact that their reading of the regulation didn't make sense. Isn't it pretty strong evidence that the policy was changed? If we're just looking at plain language, when it actually was changed and the wants and warrants language was taken out and background checks was put in. Respectfully, Your Honor, I want to call that a clarification. Or guidance, yes. And so what had happened is they continually said, we're confused, we're confused, we're confused. And the base, they were trying to accommodate them. And so they offered some guidance, some printed guidance, not just to them, but to everyone. They said, OK, we're going to do it. Is there anything in the record to suggest that when you do a wants and warrants check, you get back something more than just wants and warrants? Yes, Your Honor. There is testimony by Mr. Ward at A278, 306. He calls them synonymous. He calls them the same thing. He said, wants and warrants is just the title. That's at A316. At A320, he calls it a term of art. And the board followed it as a term of art. But it's not a term of art for a background check. It's a term of art for a wants and warrants check. I think you're not answering the question I asked. If you ask NCIC to do a wants and warrants check, I mean, maybe I shouldn't have done this, but I looked on the internet. You can look. It's a specific check. Yes, Your Honor. Does that check, do you know, does the record show, does that specific check give back more than just wants and warrants? The testimony from Mr. Ward, and I believe Colonel Finnan as well, is that, yes, it is. That is the name of, there's only one check. So just to give you an example, so in October. That's not correct. I know you're talking about. There's one check that they're doing. So in October. Yes, but the result. Right, one result. In October. Yes, but you can run multiple different kinds of checks through NCIC. Yes. Well, I assume that that's the case. Well, that's the problem. This is all very underdeveloped on what the differences between what you're referring to by wants and warrants and saying it's a term of art for a background check, when I don't think it is. I think it's a term of art for a wants and warrants check. It is. Well, I mean, then you're asking yourself, what's a background check? The point that Mr. Ward made in his testimony repeatedly was that if you put in a check for wants and warrants, it's going to come up with background information on crimes. And if it does that, instead of asking, I mean, there's no reason that the base would turn a blind eye to that. So they would rely upon that. In October 2010, as the court said, we call it guidance. And that's what it was taken for by the trial judge. But the most important thing is the check that they took after that didn't change. It's not said, oh, now we're going to do this different check. It's actually the exact same check that they'd always been doing. So that's why this is going to happen. I believe it's an email or a memo from the contracting officer in here, in which I'm looking for. I read it in the record, in which the writer says, the CO can just act at whim. I don't believe that that was the contracting officer. I believe that you'd be talking about Mr. Olson. Is that right? I don't recall. And I recall reading it when I read the Whitebridge 615. Yes. He is not the contracting officer. He had no decision-making authority. Who was it? Where is it in the record? I believe that was sent on October 8, 2008. That date sounds right. But Mr. Olson was not. We're looking for it. I will get that for you. I would like to say, just briefly, on the second part, on constructive acceleration, there's five parts. Can I just ask you one quick question? Yes, Your Honor. For the testimony that you're relying on for Mr. Ward, I think that you were maybe focusing on A316 to 317. Is that right? For Mr. Ward, A306, A313, where he calls it synonymous, A316, where he says, it's the same, it's the title, and A320, where he says it's a term of authority. Thank you. OK. Yeah, A173. And it's from Gustav Olson. And it says, depending largely wholly on the whim of the current wing commander and daily interpretation. And the problem I have with that is it seems to me a strong indication that application is being changed. It's not that it's always been that way in a clarification. It's that the new commander came in, assigned one of the staff to look at this, and then changed the policy. OK, respectfully, Your Honor. So Mr. Olson, as I understand it, works for the Corps of Engineers who were the contracting people on this. He doesn't work for the Air Force. And so, A, he has, he has, Wait, wait. We have met the enemy, and he has actually, No, I just want to make sure. It was the government. No, no, he doesn't have any role in, first of all, he doesn't have any role in reading the contract. He's not the contracting officer. But he also has zero role in the Air Force's management of their base and how they're going to read their policy. He may have had this personal opinion, but that, And experience. I have no idea what experience he had, but it was not his job to interpret or to comment on. The fact that he had an opinion makes him just like any other person who happened to be in that area. He has no authoritative opinion. They just happened to get his email. So respectfully, Your Honor, I wouldn't say that that's authoritative really for anything except for the fact that this one gentleman happened to have this one opinion. If I may just briefly address the question of constructive acceleration. I'll give you a minute, sure. I sure appreciate it. Frazier has five parts. The plaintiffs have failed to meet all five of the parts. Most importantly, or most easily, they need to show excusable delay, which means that they need to show that this wasn't foreseeable under the policy, and I think we discussed that. But they also have to show that they asked for time. They have to show that there was a request for time. This wasn't considered by the judge in the judge's initial opinion because they hadn't raised it in the initial. They raised it in a motion for reconsideration, and in that, at A333 and footnote three, in response to that motion for reconsideration, what the board judge said is, quote, there is no evidence in the record or argument in appellant's briefs that JTC asked for more time. So that should be dispositive. That closes the door on Frazier and their ability to show that they were actually injured in the way. And of course, the government, the next element of Frazier. You've got your minute. What? You've got your minute. Wrap up. OK. For those reasons, Your Honor, and those stated on our brief, we ask the court to affirm the holding of that board. Add a couple of minutes extra. Very quickly, Your Honor. In regards to the acceleration, there are two different elements. One case, a line of cases, say that you need to ask for time extensions. Others say the government just needs to be aware of the delays. And in this particular case, the government was aware of the delays, but the government's position was there was no change. Therefore, there's no excusable delay, and therefore, you get no time extension. The other thing I want to address is the meeting that was held, the pre-construction meeting. It was after the award of the contract. Two days after that pre-construction meeting, Talcott submits its initial EAL that has two convicts on it that are at the pre-release center. They are approved. They are allowed access to the base. And it continued on for another five months where these individuals were allowed upon the base. In regards to the impossibility of performance issue, I may have misspoke. In regards to was it impossible for them to perform in the time frame in which the government gave them. And in that respect, there was impossibility of performance. Throughout the record, there is a tremendous amount of information about there's a lack of workforce, there's not enough people in Montana, et cetera, et cetera. So what happens is Talcott goes out. They get whoever they can off the street to try to complete this work. So was there possibility of performance? If you give us another year, yes. If we are confined to this particular time frame, then it was impossibility of performance because the workforce was not available. And with that, unless you have other questions, I appreciate the extra time. But I think I've addressed the issue. The matter will stand submitted. And that concludes our hearing for today. Thank you. All rise. The honorable court is adjourned from day to day.